Ray D. MARTIN, Sr., Plaintiff,

v.

Otis R. BOWEN, Secretary of Health and Human Services, Defendant.

Civ. A. No. 86–2346.

United States District Court, D. Kansas.

Jan. 29, 1987.

Milton Skeens, Bunch & Skeens, Kansas City, Mo., for plaintiff.

Benjamin L. Burgess, U.S. Atty., Janice Miller Karlin, Asst. U.S. Atty., Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on the Secretary of Health and Human Services' [hereinafter the Secretary] motion for an order affirming the Secretary's decision denying plaintiff Social Security disability benefits. Plaintiff has filed a motion for summary judgment seeking reversal of the Secretary's decision.

On December 12, 1984, plaintiff filed a claim for disability benefits pursuant to subchapters II and XVIII of the Social Security Act. Plaintiff alleged that he was disabled as of September 26, 1984, due to back problems. Plaintiff's claim was denied on February 27, 1985. A hearing was conducted before an Administrative Law Judge [hereinafter ALJ] on October 4, 1985. The ALJ found that plaintiff was not under a disability as defined in the Social Security Act. Plaintiff thereafter filed a request for review by the Appeals Council, which the Council denied on April 23, 1986. The decision of the ALJ therefore stands as the final decision of the Secretary.

Judicial review of the final decision of the Secretary is pursuant to 42 U.S.C. § 405(g). The court has the power to enter a judgment affirming, modifying, or reversing the decision of the Secretary. *Id.* The findings of fact by the Secretary are conclusive if supported by substantial evidence. *Id.* Substantial evidence is more than a mere scintilla and is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Although it is not the court's duty to reweigh the evidence, the court has the duty to scrutinize the entire record in determining whether the Secretary's conclusions are supported by substantial evidence. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan. 1985). The court follows these standards while recognizing that the purpose of the Social Security Act is to ameliorate some of the rigors of life for the disabled. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir. 1965); *Holloway,* 607 F.Supp. at 72.

### The Facts

At the time of the administrative hearing, plaintiff was 51 years of age. Plaintiff has a seventh grade education and has never received any vocational training. Plaintiff's prior work history includes work as a heavy equipment operator, highway maintenance worker and laborer. Plaintiff was involved in an accident at work in June 1984, in which he claims he received disabling back injuries. As a result of this accident, plaintiff quit work in September 1984.

Plaintiff has a long history of back problems. Approximately twenty years ago, plaintiff underwent a laminectomy which involved removal of one disk and fusion of his lumbosacral spine. Plaintiff suffered a

flexion injury to his back while at work in June 1984. Plaintiff sought treatment for this injury from James Garner, M.D., an orthopedic surgeon, beginning July 25, 1984. Dr. Garner initially prescribed Nalfon to relieve plaintiff's pain. On October 3, 1984, Dr. Garner reviewed plaintiff's condition and stated that plaintiff suffered from chronic myositis (inflammation of the muscles), but ruled out radiculopathy (disease of the nerve roots). Dr. Garner noted that plaintiff was status post lumbar laminectomy and status post injury. Tr. at 115–16. Because of the pain plaintiff suffered, Dr. Garner referred plaintiff to Charles Clough, M.D., a neurosurgeon.

Plaintiff was examined at St. Joseph's Hospital on October 3, 1984. A hospital report indicated that plaintiff's lower back appeared stable but that knee reflexes were difficult to obtain without reinforcement. Tr. at 118. An electrodiagnostic study revealed the following abnormalities: (1) chronic neurogenic motor units in left L5 and S1 muscles and (2) associated prolongation of left S1 reflex arc. Tr. at 119. Several muscles in the left lower extremity were also diagnosed as abnormal. *Id.* The report also stated that the "[a]bnormal electrodiagnostic study demonstrat[es] an old healed left L5 or S1 radiculopathy. There is no suggestion on this study of an active process." *Id.*

On October 14, 1984, plaintiff was admitted to St. Joseph's Hospital for treatment and tests under Dr. Clough's care. A radiology report from October 15 revealed: "Post operative changes of the lower lumbar spine with two metallic screws on each side of the L5–S1 level. Post surgical changes at the L4–5 and L5–S1 level with posterior fusion. Upper lumbar spine shows tiny hypertrophic spurs with no other abnormalities seen." Tr. at 122. A lumbar myelography performed on October 16 revealed: "There is a mild circumfrential [sic] narrowing of the subarachnoid space at the L4–5 level, which has the appearance of scarring from prior surgical procedure. There are no lateralizing defects and no other abnormalities seen." Tr. at 121. Dr. Clough characterized plain-

tiff's myelogram as essentially unremarkable. Dr. Clough did not feel surgery was indicated and discharged plaintiff from the hospital. Plaintiff was, however, to see Dr. Clough in his office for follow-up. Dr. Clough's final diagnosis was lumbar spondylosis (dissolution of the vertebrae) with chronic low back strain. Tr. at 148.

On December 11, 1984, Dr. Clough stated in correspondence to plaintiff's insurance company that plaintiff had not made any significant recovery since his injury in June, but that at present surgery was not necessary. He also stated that he did not believe that plaintiff would be able to return to the type of work that he had previously done, and that he had suggested to plaintiff that he consider a medical disability retirement. Tr. at 125. After seeing plaintiff again on February 15, 1985, Dr. Clough reported in correspondence to plaintiff's insurance company that plaintiff's condition was basically unchanged and that he continued to have back and bilateral leg pain. *Id.* at 154.

Shortly thereafter, Dr. Clough completed a physician's statement concerning plaintiff's disability claim, making the following diagnosis: "Back pain secondary to Lumbar Spondylosis." Tr. at 156. Dr. Clough stated that plaintiff was now totally disabled and that he did not expect a fundamental or marked change in the future. He also stated that plaintiff was not a suitable candidate for trial employment. Tr. at 157. In a letter from Dr. Clough to plaintiff dated May 2, 1985, Dr. Clough told plaintiff that he considered him to be totally disabled based on plaintiff's past medical history, as well as his current physical findings. Dr. Clough recommended that plaintiff apply for Social Security disability benefits, believing that plaintiff qualified as established under the Social Security disability guidelines. Tr. at 155.

The Social Security Administration referred plaintiff to Marvin J. Fine, Ph.D., for psychological study. Dr. Fine stated that the initial impression created by plaintiff was one of "intellectual dullness" and

that plaintiff had an I.Q. score of 82. Further, Dr. Fine stated that plaintiff had difficulty with verbal expression and reasoning, and also evidenced some difficulties with social judgment. In addition, Dr. Fine observed that plaintiff tended to be very methodical and had difficulty with motor tasks that required speed. Dr. Fine noted that plaintiff was experiencing a substantial emotional reaction of a depressive nature to his physical condition. He also. stated that plaintiff appeared to have a history of physical activity that made him more comfortable in that area than in situations where he is called upon to verbalize extensively. Tr. at 127.

In February of 1985, the Social Security Administration referred plaintiff to William Buser, M.D., for a medical evaluation. Dr. Buser noted that plaintiff had a history of low back pain that radiates into the legs and up the upper back. Dr. Buser reported that plaintiff still experienced difficulty lifting objects and that plaintiff had reported to him that he is able to work only intermittently and has difficulty sitting for any prolonged period of time. Dr. Buser also noted that plaintiff took Tylenol No. 4 as needed for pain. Dr. Buser's physical examination revealed that strength and dexterity of the hands were normal and that there was no limitation of joint movement. He did note, however, that there was pain in the lumbar spine. Additionally, he noted that motor function was normal in all four extremities and that there was no muscle atrophy. Dr. Buser's conclusion was "Low back pain; S/P surgical procedure with radiculopathy." Tr. at 129–131.

Plaintiff was also referred by the Social Security Administration to John Swan, M.D., on April 27, 1985, for an evaluation. Dr. Swan's report noted that plaintiff still had difficulty with lifting and bending at that time. He also noted that plaintiff complained of morning stiffness and that it hurt when he walked. Additionally, he noted that the plaintiff used Tylenol No. 4 as needed for pain. Plaintiff's range of motion of all joints tested normal except that there was pain in the lumbar spine. There was no evidence of paraspinus muscle

spasm or muscle wasting. Dr. Swan's conclusion was as follows: "Low back pain; S/P laminectomy, with nerve root irritation." Dr. Swan concluded that plaintiff had a restricted range of motion, which was more severe than noted previously in February of 1985. Dr. Swan reported evidence of radiculopathy, apparently on a sensory and mild motor defect. He also noted that there was mild weakness and that plaintiff experienced a diminished response to a pin prick along the dorsum and medial left foot. Tr. at 139.

A radiology report by Peter Winston, M.D., made on April 27, 1985, revealed that there was near-complete obliteration of the L5–S1 disk space, associated with slight spurring and eburnation of opposing end plates. Dr. Winston noted that there was a mild narrowing of L1–2 and L3–4 with varying degrees of end play spurring at all levels between L2 and 5. He also indicated that there was facetal arthrosis (disease of the joint) at the lower two lumbar levels, and a slight narrowing of the sacroiliac joints with mild sclerosis (hardening) of opposing bony surfaces. Tr. at 140.

A functional capacity assessment was performed for the Social Security Administration by M. Hausheer, M.D., on two occasions. Both reports state that plaintiff has the strength to lift fifty pounds and to frequently lift twenty-five pounds. The reports also state that plaintiff can stand and/or walk a total of six hours in an eight-hour day. Tr. at 133, 141.

Plaintiff testified at the administrative hearing concerning his symptoms and pain as follows: Plaintiff experiences pain all the time. Tr. at 37. Almost every day he has pain in his lower back. Normally it is a dull pain, but if his back is hurting badly, it becomes a sharp pain. If he bends or lifts small objects, he experiences a sharp pain in his lower back, which often goes down his legs. Occasionally his legs become numb. Tr. at 37–38.

Plaintiff testified that he can lift approximately five to ten pounds, and that if he lifts twenty pounds his back hurts. Plain-

tiff can sit for about thirty minutes and then he has to get up and move around. He can stand for only about thirty minutes. Tr. at 51. Plaintiff can walk only about three blocks. If he walks further, he experiences pain. He also experiences pain in climbing stairs. Tr. at 55.

Plaintiff testified that he is not currently undergoing any treatment for his back, although he does take prescribed medications to lessen his pain. He also testified that he stopped doing the exercises recommended by his doctor because they intensified his pain. Tr. at 40.

Plaintiff further testified at the administrative hearing that his daily activities consisted of the following: Most of the time plaintiff just sits around the house and occasionally goes to visit his father. He rarely does any household chores for his wife during the day. (Plaintiff testified that his wife does the grocery shopping. However, in plaintiff's disability report of December 1984, plaintiff stated that he did the shopping. Tr. at 101.) He does not do any yard work because it hurts his back too bad. When he is at home, he mainly watches TV by himself. Occasionally he goes fishing. Once a day he goes to a restaurant to drink coffee. He usually experiences trouble sleeping about two nights a week because of his back pain. Tr. at 46–50. Sometimes he has difficulty in concentrating on what he is doing because of his back pain. Tr. at 58.

Finally, plaintiff testified that he can read "a little" and write, but can't spell very well. He can read books, but only slowly and if the words are not "too big." Tr. at 33. He stated that he can read a newspaper and understand what he reads if it doesn't use any "real big words." *Id.*

A vocational expert testified at the administrative hearing. He testified that plaintiff's prior work involved semi-skilled and unskilled work and that none of the skills plaintiff had in these occupations would transfer to either sedentary or light work. Tr. at 60–62. The ALJ asked the expert whether, assuming plaintiff's testimony credible, any light or sedentary jobs existed that plaintiff could perform. The expert responded that there were no light or sedentary jobs in which plaintiff could function. Tr. at 62.

### The ALJ's Findings

After reviewing the medical reports in this case and hearing the testimony of plaintiff and the vocational expert, the ALJ determined that plaintiff was not under a disability as defined in the Social Security Act. A summary of the ALJ's findings is as follows:

(1) Plaintiff suffers from a severe impairment consisting of a "status post low back surgery with residuals which may have been exacerbated by a subsequent low back injury which occurred in June 1984 and a rather substantial emotional reaction of a depressive nature to his physical problems." Tr. at 19.

(2) Plaintiff's testimony concerning the severity of his symptoms and their effect on his ability to work is not supported by (a) the claimant's testimony concerning his daily activities; (b) the objective medical evidence; and (c) the inconsistencies in his testimony. Consequently, plaintiff's testimony concerning his pain and symptoms is not credible to the extent alleged. *Id.*

(3) Plaintiff is unable to perform his past relevant work. *Id.*

(4) Plaintiff does, however, have the residual functional capacity to perform "very nearly" the full range of light work. His capacity to perform light work is reduced only by his inability to stand or walk for prolonged periods without being afforded an opportunity to change his position as needed, his inability to bend or climb more than occasionally and by his inability to engage in more than unskilled work. *Id.*

(5) Because plaintiff's residual functional capacity to perform light work is not significantly compromised by any

nonexertional limitations, Rule 202.-11,[1] Table No. 2, Appendix 2, Subpart P, Regulation No. 4 (i.e. the grids) directs a conclusion of not disabled. Tr. at 20.

### The Applicable Law

The Social Security claimant bears the burden of proving a disability within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(5). Once the claimant makes a prima facie showing of disability that prevents him from engaging in his prior work activities, the burden of going forward shifts to the Secretary, who must show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy. *Id.* at § 423(d)(2)(A); *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir.1984).

In many cases, the Secretary may satisfy this burden by relying on the so-called "grids." Through these grids, the Secretary has taken administrative notice of the number of jobs that exist in the national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very heavy). *Id.* When the ALJ's findings of fact with respect to a particular individual's vocational factors and his residual functional capacity coincide with all of the criteria of a particular rule, the existence of jobs in the national economy for that claimant is established, and the rule directs a conclusion as to whether the individual is disabled. *Id.* When, however, one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and may not direct a conclusion of disability or nondisability. *Id.* Consequently, under the regulations, "the grids may not be applied conclusively in a given case unless the claimant's characteristics precisely match the criteria of a particular rule." *Id.*

▮ In order to apply the grids, the ALJ must determine the claimant's residual functional capacity [hereinafter RFC]. Placement in one of the five categories of RFC depends on a claimant's "maximum sustained work capability," i.e., his "capacity for work activity on a regular and continuing basis." *Id.* (quoting § 404.1545(b); App. 2, § 200.00(c)). In other words, a claimant must be able to perform the *full range* of such work on a *daily basis* in order to be placed in a particular RFC category. *Id.*

▮ Furthermore, because the grids consider only impairments that result in exertional or strength limitations, they are not fully applicable where other nonexertional impairments exist. *Id.* According to the regulations, the RFC categories in the grids are based on the physical exertion requirements of work; a claimant's placement in a particular RFC category depends on his ability to do such activities as walking, standing, lifting, carrying and reaching. 20 C.F.R. §§ 404.1567, 404.1545(b). However, some medically determinable non-exertional impairments such as vision and hearing impairments and postural and manipulative limitations may affect a claimant's ability to perform certain work. *Channel*, 747 F.2d at 580. Mental impairments, such as the inability to understand and carry out instructions, and pain are likewise nonexertional impairments that may affect a claimant's ability to perform. *Id.*

▮ Where nonexertional impairments are present or where the individual does not squarely fit within a particular RFC category, the ALJ may not rely upon the grids. *Id.* Instead, the ALJ must give full consideration to all relevant facts and vocational considerations in determining whether the claimant is disabled. 20 C.F.R. § 404.1569. These vocational considerations include the claimant's age (20 C.F.R. § 404.1563), education (20 C.F.R. § 404.-1564), and work experience (20 C.F.R. § 404.1565). The ALJ may include expert

---

1. The ALJ's findings cite Rule 201.11. This apparently is a typographical error, with the correct rule being Rule 202.11.

vocational testimony, if necessary, in determining whether a claimant is disabled. *Channel,* 747 F.2d at 583.

### Analysis

In this case, the ALJ applied the grids and found plaintiff not disabled after (1) rejecting as not credible to the extent alleged plaintiff's claims of disabling pain; (2) rejecting as not credible to the extent alleged plaintiff's exertional limitations; and (3) finding that plaintiff retained the RFC to perform a full range of light work. After careful review of the record in this case, the court concludes that these findings are not supported by substantial evidence.

First, we conclude that substantial evidence does not support the ALJ's finding that plaintiff's claims of disabling pain were not credible to the extent alleged. This finding was based in part on the ALJ's conclusion that the objective medical evidence of record did not establish the existence of any demonstrable aggravation of the plaintiff's previous back condition by the alleged injury of June 1984.

■ As the ALJ correctly points out, 42 U.S.C. § 423(d)(5)(A) provides that an individual's statement as to pain is not alone conclusive evidence of disability. There must be medical signs and findings that show the existence of a medical impairment resulting from anatomical, physiological or psychological abnormalities that reasonably could be expected to produce the pain. *Id.*

■ In this case, we find there were sufficient medical signs and findings to show the existence of a medical impairment that reasonably could be expected to produce the back and leg pain to which plaintiff testified. The medical evidence establishes that plaintiff has severe impairments consisting of a status post low back surgery with residuals exacerbated by subsequent low back injury. Tr. at 19. The medical records clearly support plaintiff's testimony regarding the pain he suffers: chronic myositis, Tr. at 115; chronic neurogenic motor units, Tr. at 119; abnormal electrodiagnostic, Tr. at 119; mild circum-ferential narrowing of the subarachnoid spaces at the L4–5 level, Tr. at 121; low back and bilateral leg pain, Tr. at 124; low back pain, S/P surgical procedure with radiculopathy, Tr. at 131; low back pain, S/P laminectomy with nerve root irritation, evidence of radiculopathy, Tr. at 139; lumbar spondylosis with chronic low back strain, Tr. at 148; back pain secondary to lumbar spondylosis, Tr. at 156.

The ALJ also determined that the plaintiff's testimony concerning his daily activities did not support plaintiff's claim of pain. According to the ALJ, the fact that plaintiff admitted to working on his car, sometimes doing the grocery shopping, visiting with his father, watching TV and going fishing, indicated that plaintiff's pain was not so extreme as to significantly interfere with his normal everyday activities or prevent plaintiff from working. We must disagree. These activities do not involve prolonged physical activity and are not inconsistent with plaintiff's complaints of pain. It is well established that sporadic diversions, such as performing a few household tasks and working on cars, do not establish that a person is capable of engaging in substantial gainful activity and may not form the basis for rejecting a claimant's objective complaints of pain. *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984); *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir.1983). In sum, we conclude that substantial evidence does not support the ALJ's rejection of plaintiff's claims of disabling pain.

■ Furthermore, we conclude that substantial evidence does not support the ALJ's finding that plaintiff's claims of exertional limitations were not credible to the extent alleged. The ALJ rejected plaintiff's claims of exertional limitations for the same reasons that he rejected plaintiff's claims of disabling pain. The court finds that the medical evidence of plaintiff's treating physicians supports plaintiff's claims that he is unable to lift more than ten pounds frequently and that he is unable to sit, stand or walk for long periods of time without being afforded an opportunity to change his position. As noted above, the fact that plaintiff occasionally

engages in diversional activities does not negate his claims of exertional limitations.

■ Finally, we conclude that there was insufficient evidence to support the ALJ's finding that plaintiff retained the RFC to perform a full range of light work. Light work is defined by the regulations as work that involves the lifting of no more than twenty pounds and the frequent lifting of objects up to ten pounds. 20 C.F.R. § 404.1567(b). A job falls within this category if it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* To be considered capable of performing a full or wide range of light work, the claimant "must have the ability to do substantially all of these activities." *Id.* As we discussed above, the claimant "must be able to perform the *full range* of such work on a daily basis in order to be placed in a particular RFC category." *Channel,* 747 F.2d at 579–580 (emphasis in original). It is clear in this case that plaintiff does not retain the residual functional capacity to perform a full range of light work and that the ALJ erred in so finding.

Because the ALJ erred in making the above findings, he was not allowed to rely on the grids in making the ultimate decision that plaintiff was not disabled. This is clearly a case where the claimant's characteristics did not coincide with the corresponding criterion of the grids. Consequently, the ALJ was required to give "full consideration to all relevant facts," *see* 20 C.F.R. § 404.1569, including expert vocational testimony, if necessary, in determining whether the plaintiff was disabled. *See Channel,* 747 F.2d at 583.

■ Normally, when the ALJ has failed to give full consideration to these other factors, remand to the Secretary is required. *See id.* at 582. In this case, however, remand on this issue is not necessary. Here, the ALJ sought testimony from a vocational expert at plaintiff's hearing. The ALJ expressly asked the expert whether, given plaintiff's age, education, prior work and near-functional illiteracy and, assuming plaintiff's testimony credible, any

light or sedentary jobs, even in an unskilled capacity, existed in which plaintiff could function. The vocational expert testified that no such jobs existed. Tr. at 61–63. In other words, based on plaintiff's age, education and work experience, plaintiff's impairments are of such a severity that he is unable to engage in any substantial gainful work that exists in the national economy. Such a finding mandates the conclusion that plaintiff is disabled. *See* 42 U.S.C. § 423(d)(2)(A).

In sum, we hold that the Secretary's finding of no disability is not supported by substantial evidence. The Secretary's motion for an order affirming the Secretary's decision will therefore be denied and plaintiff's motion for summary judgment will be granted.

IT IS THEREFORE ORDERED that the Secretary's motion for an order affirming the Secretary's decision is denied and plaintiff's motion for summary judgment is granted. Judgment shall be awarded plaintiff and this case shall be remanded to the Secretary to award plaintiff disability benefits beginning September 26, 1984.